## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:13cr00017 |
| | ) | **REPORT AND** |
| ALEN JOHANNES SALERIAN, | ) | **RECOMMENDATION** |
|     Defendant | ) | |

This matter is before the court on the Motion To Dismiss And To Disqualify Government Counsel Due To Government's Improper Knowing Receipt And Review Of Privileged Defense Attorney-Client Communications, (Docket Item No. 34), ("Motion"), filed on behalf of the defendant, Alen Johannes Salerian. The Motion was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held before the undersigned on October 29, 2013. For the reasons set forth below, I recommend that the court deny the Motion.

*I. Facts*

By Superseding Indictment issued by a grand jury sitting in this district on June 25, 2013, Salerian is charged with one count of conspiracy to unlawfully distribute and 143 counts of distributing Schedule II controlled substances without a legitimate medical purpose and beyond the bounds of medical practice in violation of 21 U.S.C. §§ 846, 841 and 841(b)(1)(C). Salerian is a medical doctor with a specialty in psychiatry who previously operated the Washington, D.C., based Washington Center for Psychiatry, which was renamed as the Salerian Center for Neuroscience and Pain in 2010.

Salerian originally was charged in this district by indictment issued on April 16, 2013. This court's involvement with the investigation of Salerian dates back to at least September 2011 when the undersigned, in a sealed Memorandum Opinion, resolved a privilege issue with regard to Government subpoenas issued to Salerian and his practice's records custodian to appear before the grand jury in this district and produce certain records of his practice. The Government's investigation of Salerian, however, began some time before March 3, 2011, when search warrants were executed on his Maryland residence and his D.C. office. The charges against Salerian are scheduled for trial beginning February 10, 2014.

This matter is currently before the court on Salerian's Motion seeking the dismissal of the Superseding Indictment and disqualification of the Government's current trial attorneys from any further participation in an investigation of Salerian's conduct as alleged in the Superseding Indictment. Salerian's counsel argue that the charges against him should be dismissed because the Government's counsel, in the course of their investigation, received at least 11 separate privileged communications between Salerian and his counsel.

At the October 29 hearing, counsel for the Government, Assistant United States Attorney Jennifer Bockhorst, testified that the Government received these communications between Salerian and his counsel from grand jury witness Lynette Rash, ("L. Rash"). Bockhorst stated that, some time prior to May 15, 2012, L. Rash approached the U.S. Attorney's Office stating that she had information that she wished to share regarding Salerian. Bockhorst stated that the first time she saw the notebook containing the communications between Salerian and his counsel, ("Notebook"), was on May 15, 2012, when she met with L. Rash for a proffer session. L. Rash brought the Notebook to the meeting with Bockhorst and offered it to her. Bockhorst testified that she opened the Notebook in order to peruse the

contents. Bockhorst stated that the first document she saw was some nondescript correspondence. The next document she saw, however, was on the letterhead of Salerian's counsel, Glen Donath, and contained a heading stating "Privileged Communication." Bockhorst stated that she immediately closed the Notebook and did not read the contents of this letter or any other document contained in the Notebook. Bockhorst testified that L. Rash told her that she had been given the Notebook by Salerian. Bockhorst stated that neither she, nor the case agent present at this meeting, Nick Worsham, took custody of the Notebook that day. A subpoena was obtained for L. Rash to appear before the grand jury on the next day and to produce all records regarding Salerian in her possession.

Bockhorst testified that L. Rash appeared and testified before the grand jury on May 16, 2012. During L. Rash's testimony, Bockhorst questioned her about how she had obtained the Notebook. Based on L. Rash's testimony, Bockhorst stated that she had concluded that any privilege that may have applied to the contents of the Notebook had been waived by Salerian when he gave the Notebook to L. Rash. Bockhorst stated that, after L. Rash's grand jury testimony, she instructed Worsham to take custody of the Notebook, to place it in a sealed folder and mark that it potentially contained privileged material and place it, along with the other evidence provided by L. Rash, in the grand jury evidence room at the Abingdon U.S. Attorney's Office. Bockhorst stated that the only persons who had access to this grand jury evidence room were employee of the U.S. Attorney's Office and, on occasion, various federal agents who placed evidence in the room.

Bockhorst testified that L. Rash actually went on to serve in the investigation of Salerian in an undercover informant capacity. Eventually, however, the Government decided to discontinue using L. Rash in this capacity.

Bockhorst testified that she has not reviewed the contents of the Notebook and, in fact, she had forgotten about the Notebook and its contents until earlier this year. Bockhorst could offer no explanation for why she had forgotten about the Notebook except to say that, at some point in the investigation, the Government had decided not to use any evidence provided by L. Rash. Bockhorst stated that earlier this year, the Government's trial team had decided to disclose all of the evidence in its possession to Salerian's defense counsel. Bockhorst said that in June she assigned a staff member in the U.S. Attorney's Office, Lori Sykes, to scan the remaining documents into electronic format, save them to the Salerian discovery folder on the shard T drive of the office computer system and place them on a computer disc that would be given to defense counsel. Bockhorst stated that when, on July 18, 2013, she reviewed a list of the documents Sykes had scanned into electronic form and saved in the discovery folder on the T drive, she realized that it contained information that might be protected under the attorney-client privilege. Bockhorst testified that she immediately stopped reviewing the material contained in the discovery folder, and she instructed Dennis Lee, Special Assistant United States Attorney, ("SAUSA"), assisting in the prosecution of Salerian, not to access the folder until such time as all potentially privileged information was removed.

Bockhorst testified that, despite these events, she still did not remember that the Government had taken custody of the Notebook from L. Rash containing potentially privileged information. Bockhorst testified that she immediately notified defense counsel that she had discovered 14 potentially privileged documents within the documents the Government was preparing to produce to defense counsel. Bockhorst stated that she then called in a previously designated "taint" team, including Special Assistant United States Attorney Janine Myatt and her legal assistant, Mary Blackburn, who reviewed the contents of the discovery

-4-

folder on the T drive and removed any potentially privileged information. Bockhorst stated that she had been informed by Myatt that the entire contents of the Notebook received from L. Rash had been scanned and placed in the Government's discovery folder.

Bockhorst testified that, to date, she has not reviewed any of the contents of the Notebook. She also stated that she was not aware of anyone else on the Government's trial team reviewing the contents of the Notebook. She stated that only employees of the U.S. Attorney's Office had access to the shared T drive on the office computer system. Bockhorst stated that she knew that she had not reviewed any of the correspondence contained in the Notebook because she had not reviewed any correspondence between Salerian and his counsel at any time during the investigation.

Special Agent Nick Worsham testified that he was present when L. Rash was interviewed by Bockhorst on May 15, 2012. He stated that L. Rash arrived with several notebooks in her possession containing material that she claimed was relevant to the Government's investigation of Salerian. Worsham testified that Bockhorst opened one of these notebooks and saw that it contained letterhead from Salerian's counsel, and she closed the Notebook and did not examine its contents any further. Worsham stated that he took possession of this and the other notebooks from L. Rash on May 16, 2012, pursuant to a grand jury subpoena after L. Rash had finished testifying. Worsham testified that he placed the Notebook inside of a folder and taped in shut. He stated that he marked the folder as containing potentially privileged information. Worsham stated that he placed the folder in a box with the other evidence and gave the box to the staff at the U.S. Attorney's Office to be placed in the grand jury evidence room that same day. Worsham said he never saw the box or the Notebook again after that date and that

he was reassigned out of the Western District of Virginia in July of 2012. Worsham testified that he never reviewed the contents of the Notebook and that he did not have access to the U.S. Attorney's Office computer system's shared T drive.

Lori Sykes also appeared and testified. Sykes testified that she worked at the U.S. Attorney's Office from June 1, 2012, to July 24, 2013. Sykes stated that she began scanning evidence in the Salerian case when she first started work at the U.S. Attorney's Office and that she continued until her last day working at the office. Sykes stated that she did not specifically remember opening any sealed folder marked that it contained potentially privileged material and did not remember scanning the contents of the Notebook.

Attorney Ann Margaret Brammer from Tazewell, Virginia, also testified. Brammer stated that she previously had represented Rob Rash, ("R. Rash"), L. Rash's son, on state drug charges brought by Lee in his role as Tazewell County Commonwealth's Attorney. Brammer testified that, through her representation of R. Rash, she developed a close relationship with L. Rash. Brammer stated that she met Salerian at L. Rash's home in Abingdon on one occasion when she traveled there to consult with her client. On this occasion, Brammer stated, she asked Salerian to provide certain of R. Rash's records to her. Sometime later, Brammer said, L. Rash delivered some notes from Salerian to her.

Brammer testified that she spoke to Salerian on one occasion on the telephone regarding his treatment of her client. On this occasion, Brammer said, Salerian told her that he may want to retain her to represent him on some civil charges, but he never told her the subject matter of the representation. Brammer stated that she never spoke any further with Salerian of representing him because

she had no intention of taking him as a client. Brammer specifically testified that she never told Salerian she would represent him.

Brammer stated that several weeks, or possibly months, after her telephone conversation with Salerian, L. Rash brought the Notebook from Salerian to her for her review. Brammer said that L. Rash told her that she thought the contents of the Notebook would help her son's case. Brammer stated that she never took the Notebook from L. Rash. Brammer said that L. Rash felt like she and her son were being persecuted by Lee. L. Rash's son, Brammer said, faced a substantial sentence if convicted of the charges he faced. Brammer stated that, according to L. Rash, L. Rash wanted to show her the Notebook because L. Rash thought its contents showed that Salerian was being persecuted like she believed her son was being persecuted.

Brammer testified that L. Rash did not tell her that she was acting on behalf of Salerian when L. Rash offered the Notebook to her. Brammer testified that L. Rash did not say that she was instructed by Salerian to give Brammer the Notebook with regard to her potential representation of Salerian. She also testified that L. Rash did not act as her agent in bringing the Notebook to her.

Brammer stated that she was present with L. Rash at the proffer session at the U.S. Attorney's Office on May 15, 2012. Brammer stated that she had told L. Rash to bring with her any documents that she possessed which she thought would help. Brammer stated that L. Rash was not under any type of subpoena to appear and produce evidence to the Government at this time. Instead, she stated that the meeting had been arranged because L. Rash believed it would help her son in his state court prosecution. Brammer stated that, at this meeting, Bockhorst opened

one of the notebooks brought by L. Rash and then quickly closed it back after seeing that it contained correspondence from Salerian's counsel.

Brammer stated that, at L. Rash's request, she accompanied L. Rash on a trip to Houston, Texas, to meet with Salerian and Ron Paul. Brammer stated that she understood the purpose of the trip to be for her to represent R. Rash's legal problems to Ron Paul during a meeting Salerian had arranged with Paul to present him with a $50,000 donation to Paul's presidential campaign. Brammer stated that she, L. Rash and Salerian never met with Paul on this trip.

Brammer stated that her client and L. Rash cooperated in the federal investigation of Salerian. She said that the state court judge who sentenced R. Rash was made aware of this cooperation. She said that R. Rash received a total four-year sentence on the charges he faced.

According to the grand jury testimony of L. Rash[1], she obtained the Notebook from Salerian. L. Rash testified that Salerian gave her stacks of papers on more than one occasion, including many of her son's records. (Government's Exhibit No. 1, (Docket Item No. 61), Transcript of the May 16, 2012, grand jury testimony of Lynette Rash, ("Rash Transcript"), at 70-72.) Concerning her possession of the Notebook, L. Rash testified:

A   …And he wanted me to take [the Notebook], he actually offered me two, one for myself and one for [Ann Brammer], to take for her to

---

[1] A transcript of the grand jury testimony of L. Rash was submitted into evidence under seal for the court's review in this case. To protect the secrecy of the grand jury proceedings, this testimony will be outlined here only insofar as it impacts the court's decision as to the privilege issue.

|   | review the documents…. [H]e just told me, he said "Here, take this, Lynn." |
|---|---|
| Q | And what did you say in response? |
| A | I told him, you know, I just needed one and – |
| Q | Okay. I mean well, did you tell him you would take it to the, to the attorney? |
| A | Oh, yes. I, I told him that I would take it. |
| Q | To, to your attorney? |
| A | Yes. |
| Q | You didn't say something about you not being an agent of the attorney? |
| A | Oh, oh, I – |
| Q | That you wouldn't deliver it? |
| A | No. He asked me if I could assure, you know, he wanted Ann to, to be his attorney. |
| Q | All right. |
| A | And I told him that I was not an agent of Ann's; I couldn't tell him if Ann would be his attorney or not. |
| Q | Okay. |
| A | And that's when he wanted me to take that. Yes, I did say that. |
| Q | All right. And was that notebook for Ann or was that notebook for you, the one that you took? |
| A | He, he actually wanted us to – I – me to take two, you know, one for myself, one for her, and I said, "I only need one," so I took it and I told him that I would share it. |
| Q | Okay. Okay. |
| A | And, of course, Ann said she didn't want to be his attorney, so I still have it. |
| Q | All right. And did you, and did you relay that back to Dr. Salerian, that Ann did not want to be his attorney? |
| A | Yes. |
| Q | Did he ask you for that notebook back? |
| A | No. |
| Q | Okay. |
| A | No, he hasn't asked me for anything back. |

(Rash Transcript at 112-13.)

*II. Analysis*

In federal court proceedings regarding federal law, questions of evidentiary privileges are determined by federal law. *See* FED. R. EVID. 501, 1101(c), (d)(2); *United States v. Gillock*, 445 U.S. 360, 367-68 (1980). "Federal Rule of Evidence 501 provides that privileges in federal court are to be 'governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.'" *United States v. Dunford*, 148 F.3d 385, 390 (4th Cir. 1998). "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

> When the attorney-client privilege applies, "it affords confidential communications between lawyer and client complete protection from disclosure." ... However, because this privilege "impedes the full and free discovery of the truth," it must be "narrowly construed and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."

*In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir. 2003).

In *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982), the Fourth Circuit adopted the classic test for application of the attorney client privilege.

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal

> proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

The proponent of the privilege carries the burden to demonstrate is applicability. *See Jones*, 696 F.2d at 1072. "The proponent must establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *Jones*, 696 F.2d at 1072. In general, a voluntary disclosure by the client to a third-party waives the privilege. *See Jones*, 696 F.2d at 1072. "Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege." *Jones*, 696 F.2d at 1072.

Here, there appears to be no disagreement that the communications contained in the Notebook, being communications between Salerian and his counsel regarding his counsel's representation, are communications that should be privileged. The issue here is whether, by giving the Notebook containing these communications to L. Rash, Salerian waived any privilege.

As stated above, it is Salerian's burden to prove that he has not waived his attorney-client privilege with regard to the contents of the Notebook. Based on the facts before the court, I find that Salerian has failed to prove that he did not waive his attorney-client privilege with regard to the contents of the Notebook by providing these documents to L. Rash for her review. L. Rash's grand jury testimony establishes that, based on the facts and circumstances surrounding Salerian's disclosure of the Notebook to L. Rash, L. Rash thought that Salerian was providing the Notebook to her for her review and to "share" its contents with Brammer. In particular, L. Rash testified that Salerian wanted her to take two notebooks – one for Brammer and one for herself. Also, there is no evidence

before the court that Salerian instructed L. Rash not to review or not to share the contents of the Notebook with whomever she pleased. In fact, Brammer's testimony establishes that L. Rash had reviewed the contents of the Notebook, because Brammer stated that L. Rash said the contents showed that Salerian was being persecuted. Furthermore, L. Rash's actions in voluntarily sharing the Notebook with Bockhorst with no warning that it contained privileged material supports a finding that she was not instructed to hold it in confidence. Based on the court's finding that Salerian has not met his burden to show that the contents of the Notebook should be protected by the attorney-client privilege, there can be no finding that the Government improperly received and reviewed privileged information. That being the case, I recommend that the court deny the Motion on this ground.

I further find that the evidence before the court establishes that the Government's trial team did not review the contents of the Notebook. Bockhorst's, Brammer's and Worsham's testimony establishes that, when L. Rash tendered the Notebook to Bockhorst, she opened the Notebook and then closed it as soon as she saw that it contained communications from Salerian's counsel. Bockhorst testified that she had not reviewed the contents of the Notebook. Worsham also testified that he did not review the contents of the Notebook. Bockhorst also testified that, when reviewing a listing of documents in the case that had been scanned into electronic format, she realized that her office's computer system contained potentially privileged information. At that point, Bockhorst testified, she did not access the folder containing that information until after Myatt had reviewed the contents of the folder and removed any potentially privileged information. Bockhorst testified that she instructed SAUSA Lee not to access the folder as well. Bockhorst further testified that, to date in this investigation, she has not reviewed any communications between Salerian and his counsel. This is noteworthy in light

of the fact that defense counsel themselves filed the contents of the Notebook with the court in such a way as to allow the Government access to the materials.

Without a finding that the Government's trial team actually reviewed the alleged privileged information, there can be no Sixth Amendment violation. In *Weatherford v. Bursey*, 429 U.S. 545, 556 (1977), the Supreme Court found no intrusion upon or violation of a criminal defendant's Sixth Amendment right to counsel based on an undercover officer's presence at meetings between the defendant and his counsel when the evidence showed that the officer had not conveyed the content of these meeting to the prosecution. *See also Hoffa v. United States*, 385 U.S. 293, 305-06 (1966) (Court found it necessary to deal with Sixth Amendment right-to-counsel claim only after finding that an informant had reported content of overheard discussions between criminal defendant and counsel to the prosecution). In *Weatherford*, the Court specifically rejected the Fourth Circuit's ruling that a constitutional violation had occurred regardless of "whether or not [the undercover officer] reported on the meeting to his superiors, and whether or not any specific prejudice to the defendant's preparation for or conduct of … trial is demonstrated or otherwise threatened." 429 U.S. at 550.

Needless to say, the court cannot commend the Government's action in taking possession of potentially privileged information in this investigation, forgetting that it was locked away in its grand jury evidence room for more than a year only to "rediscover" the evidence after it was scanned and placed in electronic format on the U.S. Attorney's Office's computer system. Complex cases require the adoption of processes and procedures by which the Government can be assured that it knows what evidence is in its possession and that it is complying with its disclosure obligations. The facts of this case, however, do not support a finding that Salerian's Sixth Amendment right to counsel was violated, much less the

imposition of the severe sanctions of dismissal of the charges or the disqualification of the Government's counsel.

**PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Salerian has failed to meet his burden to show that he did not waive his attorney-client privilege as to the contents of the Notebook by giving that Notebook to L. Rash;

2. Regardless of whether the contents of the Notebook remain protected by the attorney-client privilege, the Government's trial team did not review the contents of the Notebook; and

3. The facts of the case do not support a finding that Salerian's Sixth Amendment right to counsel has been violated.

**RECOMMENDED DISPOSITION**

For the reasoning set out above, the undersigned recommends that this court deny the Motion.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the

report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations could waive appellate review.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

ENTER: November 8, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE